CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

LLOYD FARNHAM (CABN 202231)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Lloyd.farnham @ usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) | Case No. 19-CR-00463 RS |
|---|---|---|
| Plaintiff, | ) ) ) | UNITED STATES' MEMORANDUM ON RESENTENCING |
| v. | ) ) | |
| SIVANNARAYANA BARAMA, | ) ) ) | |
| Defendant. | ) ) | |

## I.    INTRODUCTION

This case is before the Court for resentencing after defendant Barama's case was remanded from the Ninth Circuit. The Court of Appeals panel, in an unpublished Memorandum Disposition, affirmed the conviction but concluded that the Court misapplied the Sentencing Guidelines and remanded for resentencing on an "open record," meaning that this Court is free to examine the facts and legal issues anew. Based on the new controlling authority in this circuit, the facts of this case, and new analysis provided by the government's expert witness, the Court should find that the Guidelines loss adjustment in this case should be determined using the defendant's gain from the fraud. This gain amount is undisputed and consists of the illegal profits made by defendant Barama when he traded Palo Alto Networks securities based on the information he misappropriated from the company. This is how the

US MEMORANDUM ON RESENTENCING         1
19-CR-00463 RS

Court determined the loss and offense level adjustments at the first sentencing; the Court should do so again and impose the sentence previously imposed.

After the appeals panel remanded this case for resentencing in an unpublished disposition on the grounds that "loss" as used in U.S.S.G. § 2B1.1 was not ambiguous, and therefore the commentary regarding the use of gain must be disregarded, a published Ninth Circuit opinion concluded the opposite. Based on this new intervening and controlling authority, the Court should find that the applicable guidelines range is the same as originally calculated, and should reimpose the same sentence. *United States v. Yafa*, 136 F.4th 1194 (2025) is directly on point. In that case the Ninth Circuit held that "loss" as the term is used in U.S.S.G. § 2B1.1 is genuinely ambiguous, and district courts must give deference to the commentary interpreting the term—meaning here that this Court should use gain as an alternative measure of loss because the loss is reasonably difficult to determine. The *Yafa* holding specifically addressed the precise language in the commentary at issue here and affirmed the district court's use of the gain as an alternative measure of loss in a securities fraud case.

Even if the Court disagrees with the government on this legal argument, the record before the Court supports the finding that the gain Barama obtained by converting the stolen information to money is an appropriate and reasonable measure of the loss to the victim public company whose information was stolen and used to trade in the company's stock.

For these reasons, the government recommends that the Court reimpose the sentence originally determined warranted under the factors of 18 U.S.C. § 3553(a), 18 months in custody.

II.    **BACKGROUND**

A.    **Barama is Charged with Insider Trading and is Convicted at Trial**

Barama was charged in a 2019 indictment with securities fraud under 18 U.S.C. § 1348 and conspiracy under 18 U.S.C. § 1349, based on allegations that he knowingly misappropriated confidential business information of public company Palo Alto Networks, Inc. (PANW) and used that information to trade in the company's securities. After a two-week jury trial in December of 2022, Barama was convicted of four counts of violating Section 1348(2).

The evidence at trial showed that Barama learned confidential information about PANW's earnings before public release from his former colleague at PANW, Janardhan Nellore. In dozens of

phone calls and hundreds of text messages, Nellore tipped Barama with the inside information, and for four quarters in a row Barama made profitable securities trades capitalizing on the information. For just those four quarters, from November 2016 to August 2017, Barama's trading on the information—which the jury found he knew had been stolen from PANW—resulted in profits of more than $6.6 million.

The government's original sentencing memorandum (Dkt. 260), and the final Presentence Report (Dkt. 259), includes additional details about the facts proven at trial, the facts underlying Barama's conviction, and the circumstances relevant to sentencing, all of which are still relevant to this resentencing proceeding. At the sentencing hearing, the Court adopted the PSR and its guidelines calculation, which included a +18 offense level adjustment based on the profits from Barama's trading, and sentenced Barama to 18 months in custody, a variance from the guidelines range of 57-71 months.

**B.        On Appeal Barama's Conviction was Affirmed but his Sentence was Vacated**

Barama appealed his conviction and sentence. After briefing and oral argument, a Ninth Circuit panel issued a Memorandum Disposition affirming the conviction but remanding the case for resentencing. The appeals court rejected Barama's argument on appeal that the evidence was insufficient for the convictions, finding that the evidence showed that Barama obtained the confidential information through false pretenses and aided and abetted Nellore's fraud. Memorandum at 3-4 (*United States v. Barama*, No. 23-2087, Jan. 27, 2025). The appeals court also rejected the argument that the Court constructively amended the indictment on plain error review, and rejected challenges to the jury instructions regarding the element of materiality and failure to include a "personal benefit" element. Memorandum at 4-7.

Regarding the sentence, on appeal Barama argued that the Court procedurally erred by pinning the losses to the trading gains and using that amount (more than $6.6 million) to determine the total offense level under Section 2B1.1 of the Sentencing Guidelines. The appeals court determined that under a 2023 Ninth Circuit case, *United States v. Castillo*, 69 F.4th 648, interpreting *Kisor v. Wilkie*, 588 U.S. 558 (2019), the Court should only have relied on the guideline commentary at issue if the term "loss" is ambiguous. The panel concluded that "loss" in the Guidelines version used at sentencing "was not so ambiguous as to allow for a 'gain' that does not approximate the victim's loss" and ruled "the district court erred in using Barama's gain as a substitute for PANW's loss…" Memorandum at 8. The

appeals court remanded for resentencing "on an open record." *Id.* The Court also specifically noted that *Castillo* did not foreclose using "gain" as a proxy for "loss" and the government may "demonstrate on remand that Barama's profits constitute a reasonable approximation of PANW's loss." *Id.*

## C.    The Sentencing Guidelines Provisions Regarding Loss and Amendments

Under 18 U.S.C. § 3742(g)(1), this Court should use the same version of the Guidelines that was used at the original sentencing hearing—in this case that was the version effective November 1, 2021. *See* PSR at ¶ 65. That version of the Sentencing Guidelines contains Section 2B1.1, which states under 2B1.1(b), "Specific Offense Characteristics," that "If the loss exceeded $6,500, increase the offense level as follows: … (J) More than $3,500,000 add 18." *See* U.S.S.G. 2B1.1(b)(1) (Nov. 2021).

That version's commentary to Section 2B1.1 stated the following regarding the use of gain instead of loss:

> (B) Gain.—The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.

U.S.S.G. § 2B1.1, cmt. n.3(B) (Nov. 2021).

As noted in the Memorandum Disposition, in recent revisions of the Guidelines effective Nov. 2024 (the first version to contain this amendment) and Nov. 2025 (the version currently in effect), the relevant language on the use of gain to measure loss is now in the guideline provision itself, not the commentary, under the heading "*Notes to Table:" under 2B1.1(b)(1), and includes the language previously in the commentary:

> (B) Gain.—The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.

## D.    Scoufis Analysis Regarding PANW Economic Harm and Losses

Alexander Scoufis is an Assistant General Counsel in FINRA's Criminal Prosecution Assistance Group and testified at the trial in this case as an expert on public securities, the securities markets, and stock options. He has prepared a declaration, attached to this filing, that addresses issues relevant to these sentencing proceedings.

In his declaration, Scoufis analyzes various ways to consider the loss caused by the trading in this case, and he explains a few examples of the economic harm caused by Barama's illegal trading:

(1) harm to and losses suffered by the unknown (and difficult to identify) parties on the other side of Barama's options trades, who lost amounts commensurate with Barama's gains because they traded without knowing the inside information Barama had, (2) harm to PANW through its shareholders, who may have been involved in trades and market activity and lost money as Barama capitalized on misappropriated information to the detriment of those shareholders, and (3) harm to PANW through skewed price discovery while the company itself was a market participant through the share buyback authority. Scoufis Decl. at 3-5.

Scoufis also opines that the information improperly obtained by Barama had an economic value that Barama converted to funds in his trading account through securities trading. *Id.* at 5. Scoufis considers the various ways that such information could be converted to money, and reasons that the value of the particular information Barama misused can be approximated as at least the "proceeds from converting the MNPI through his trading in advance of the four earnings announcements in 2016 and 2017." *Id.* at 5-6. Scoufis considers this estimate as a floor, not an upper limit, to the value, meaning it is at least valued at the amount Barama was able to profit on the information. *Id.* at 5-6.

Scoufis also addresses the reputational and regulatory risk that companies like PANW risk when insiders profit on misappropriated information in the public stock markets. *Id.* at 6.

## III.    ARGUMENT

### A.    New Controlling Authority Allows Use of Gain to Measure Guidelines Loss

New controlling Ninth Circuit precedent published *after* the Memorandum Disposition in this case holds that this Court must give deference to the Section 2B1.1 commentary that directs the use of gain as an alternate measure of loss.

In *United States v. Yafa*, 136 F.4th 1194 (May 15, 2025), the Ninth Circuit answered a question that had been unresolved, namely whether the Sentencing Commission's commentary to Section 2B1.1 regarding the term "loss" in U.S.S.G. § 2B1.1(b)(1) should be given deference or must be disregarded. In Barama's appeal, he cited the Third Circuit's *United States v. Banks*, 55 F.4th 246 (2022), which held that the word "loss" in U.S.S.G. § 2B1.1(b)(1) is unambiguous and so commentary permitting consideration of "intended loss" was inconsistent with the guideline text and should be disregarded. *Id.* at 258. At the time Barama's appeal was heard, the Third Circuit was alone in this view, and in *Yafa*,

this circuit came to a different conclusion and declined to join the Third Circuit.

In the *Yafa* case, the defendants were convicted of securities fraud and conspiracy to commit securities fraud for a "pump-and-dump" stock manipulation scheme. The district judge determined that the losses to the public stock shareholders would be difficult to calculate and relied on gain to determine the appropriate adjustment under U.S.S.G. § 2B1.1, explicitly relying on Application Note 3(B). 136 F.4th at 1197. The Ninth Circuit affirmed the sentence and the district court's use of the commentary to conclude that gain was the appropriate measure of loss. The *Yafa* Court explicitly held that under the appropriate application of *Kisor v. Wilkie*, 588 U.S. 558 (2019) (addressing deference to agency interpretations of its own rules), the Sentencing Commission commentary regarding loss was binding on the district court because the commentary met all three *Kisor* requirements: the term "loss" is genuinely ambiguous, the commentary's interpretation of the term is reasonable, and the interpretation is entitled to controlling weight. *Id.* at 1197-1200.

The panel deciding the appeal in this case also relied on *Kisor*, and *United States v. Castillo*, 69 F.4th 648 (2023), a Ninth Circuit case that held that unless a Guidelines section is ambiguous a district court cannot look to the commentary. *Yafa* conforms to both *Kisor* and *Castillo* and holds that "loss" as used in U.S.S.G. § 2B1.1(b)(1) is "genuinely ambiguous," and therefore district courts must look to the commentary for interpretation of the term.

Barama's appeal disposition is non-precedential, and since that order and the mandate issued (on February 19, 2025, Dkt. 304) the Ninth Circuit has answered (on May 15, 2025) the specific question raised in the appeal and at issue here on resentencing. Therefore, this Court must apply this new precedent when resentencing on an open record and should consider the Sentencing Commission's commentary as the controlling interpretation of the Guidelines section at issue—which permits this Court to use gain when there is a loss that cannot reasonably be determined.[1]

The gain in this case is clear and was established by evidence at trial, and there has been no

---

[1] The "law of the case" doctrine does not preclude the Court from applying new controlling Ninth Circuit law to this case on resentencing, even where the Barama appeals panel came to a different result on the same legal question. The Ninth Circuit recognizes an exception to the law of the case doctrine when there is "intervening controlling authority." *Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997), overruled in part on other grounds, *Gonzalez v. Ariz.*, 677 F.3d 383, 389 (9th Cir. 2012).

dispute about how the trading profits were calculated either at sentencing or on appeal. Through his illegal and fraudulent trading using misappropriated PANW business information, in advance of the release of financial results for four consecutive quarters, Barama profited $6,673,077.

The record in this case, both prior to the original sentencing and considering the Scoufis analysis, supports the finding that there was a financial and economic loss here. PANW's shareholders who traded securities while Barama traded—including the counterparties described by Scoufis—were disadvantaged because they did not have the benefit of the embezzled information. At trial, PANW's deputy CFO testified that disclosure and use of confidential business information could harm PANW and its shareholders. PANW shareholders are owners of the company, and to the extent they are harmed PANW is harmed. Scoufis Decl. at 4.

Other considerations support the conclusion that Barama's conduct caused losses. Courts have agreed that insider trading involves economic harm to both shareholders and companies like PANW that rely on the public markets for capital. *See, e.g.*, *United States v. O'Hagan*, 521 U.S. 642, 658 (1997) ("investors likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law."). Likewise, the Sentencing Commission has recognized that insider trading involves "loss," though one that is difficult or impossible to identify. U.S.S.G. § 2B1.4 cmt n.Background.[2]

The trial evidence showed the significant steps PANW took to protect the confidentiality of financial information before its public release. For example, the company required all employees to keep this information confidential, imposed blackout periods that precluded employees from trading when any employee might know financial information before the market did and required all employees and contractors to acknowledge these policies. As noted in the Scoufis declaration, disclosure of the confidential financial information could hurt PANW's reputation and harm its shareholders who did not

---

[2] Because of technical aspect of the drafting of the Guidelines, the more specific insider trading guideline provision, Section 2B1.4, applies only to insider trading charged under the securities fraud statute listed, 15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5. The charge of conviction here, 18 U.S.C. § 1348, does not appear in the Statutory Index or the language of the guideline, so under the Guidelines application rules, the Court cannot apply this guideline. However, the existence of this provision and its focus on the gain from trading as explained by Sentencing Commission's commentary can be considered by the Court in determining the appropriate measure of loss in this case.

have the confidential information used by Barama to trade. As Scoufis testified at trial and notes in his declaration, public companies such as PANW report important information through Form 8-K filings with the SEC to ensure fairness by making information available to all PANW investors. The inappropriate use of that information by Barama to make very profitable options trades harmed PANW's economic and regulatory interests.

Undisputably, it is difficult to assign a dollar value to these losses. For this reason, the Court should, as the Guidelines and the Ninth Circuit precedent directs in this situation, "use gain that resulted from the offense as an alternative measure of loss" and find that the +18 level adjustment under Section 2B1.1(b)(1)(J) is appropriate in this case.

**B.      In Any Event, Barama's Profits Are a Reasonable Approximation of PANW's Loss**

Even under the most restrictive reading of the Guidelines adopted by the Barama appeal panel (which is no longer good law in the Ninth Circuit), the panel did not foreclose using gain to determine the appropriate guidelines range here, writing:

> Because *Castillo* did not address and foreclose the use of "gain" as a proxy for "loss," the government may have an opportunity to demonstrate on remand that Barama's profits constitute a reasonable approximation of PANW's loss.

Memorandum at 8. The record in this case supports a finding that Barama's profits that he derived from the illegal misappropriation of stolen confidential information are a reasonable approximation of the losses he caused to PANW when he embezzled and misused the information.

PANW was the victim of the crime here, and it was PANW's property—in the form of confidential business information—that was misappropriated. Put another way, PANW lost the right to control and have exclusive use of that property. One way to value that property, and to show that it had economic value, is to use the "market value" of the information. In this case, that market value was determined by Barama when he traded options using the misappropriated information. As Scoufis opines:

> First, in order to realize the economic value of the misappropriated MNPI a trader could use the information to make well-timed and profitable trades in options or stock, as Barama did. The value of the MNPI can be considered to be at least Barama's proceeds from converting the MNPI through his trading in advance of the four earnings announcements in 2016 and 2017.

US MEMORANDUM ON RESENTENCING          8
19-CR-00463 RS

Scoufis Decl. at 6. Scoufis believes that this method actually underestimates the value of the information, as other market participants and more sophisticated traders may have been able to convert the information into higher amounts. *Id.*

The facts of this case support a finding that the gains Barama realized from the information are a reasonable approximation of loss not because that gain came directly from PANW's financial accounts or balance sheet, but because that gain is one way of valuing the information that was misappropriated from the company. If the Court adopts this approximation of loss, the offense level enhancement for $6.6 million in loss should also be applied to Barama's guidelines calculation.

**C.    The Appropriate Sentence in this Case**

The government acknowledges that there are significant mitigating circumstances that may justify a below-guidelines sentence in this case, as the Court found when it imposed the original sentence in this case. Some of those circumstances were present at the initial sentencing, such as Mr. Barama's health issues, and others have arisen or worsened since the last hearing. However, any sentence in this case should take into account the nature and severity of the financial crime committed by Barama, and consider the factors of punishment, deterrence, and protecting the community by preserving the integrity of the United States' capital markets.

The government recommends that the Court impose the sentence it previously considered warranted by the serious nature of the crime, the need for general and specific deterrence, and by the individualized circumstances of this conduct and this defendant.

DATED: June 23, 2026                                         Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney


                                                                  /s/
LLOYD FARNHAM
Assistant United States Attorney

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

LLOYD FARNHAM (CABN 202231)
Assistant United States Attorney

  450 Golden Gate Avenue, Box 36055
  San Francisco, California 94102-3495
  Telephone: (415) 436-7200
  FAX: (415) 436-7234
  Lloyd.farnham @ usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 19-CR-00463 RS |
| Plaintiff, | |
| v. | DECLARATION OF ALEXANDER SCOUFIS |
| SIVANNARAYANA BARAMA, | |
| Defendant. | |

I, Alexander Scoufis, declare as follows:

1.     I am currently an Assistant General Counsel in the Criminal Prosecution Assistance Group ("CPAG") of FINRA's Office of General Counsel. I have worked at FINRA since May 2015. I worked for approximately 18 months in FINRA's Office of Fraud Detection and Market Intelligence where I investigated insider trading violations. In 2016, I began working in CPAG where I assist federal and state prosecutors with criminal investigations and trials involving securities fraud and related offenses.

2.     I testified as an expert witness called by the prosecution at the trial in this matter in December 2022. During that testimony I was designated as an expert witness on securities of public companies, the securities markets, and stock options.  In particular, that testimony related to the

DECLARATION OF ALEXANDER SCOUFIS          1
19-CR-00463 RS

investigation and criminal prosecution by the U.S. Attorney's Office for the Northern District of California regarding trading in publicly traded securities of Palo Alto Networks, Inc. ("PANW") by Janardhan Nellore and Sivannarayana Barama.

3.   After that trial and the appeal of the conviction and sentence, the U.S. Attorney's Office asked me to provide an opinion and relevant information for consideration in the determination of loss attributable to defendant Sivannarayana Barama's trading in PANW securities based on material non-public information ("MNPI") misappropriated from PANW.

**Background**

4.   According to the evidence presented at trial, Nellore was an employee of PANW who repeatedly accessed MNPI through his work at the company and provided the MNPI to Barama. Barama utilized the MNPI to buy and sell PANW call and put option contracts. As indicated in the following chart, Barama took increasingly larger positions prior to four earnings announcements, and realized increasingly larger profits:

| Barama Insider Trading | | |
|---|---|---|
| **PANW Earnings Announcement Date** | **Cost to Enter Position** | **Profits from Trading on MNPI** |
| 11/21/2016 | $122,560 | $193,280 |
| 2/28/2017 | $587,811 | $1,233,978 |
| 5/31/2017 | $1,831,610 | $3,135,069 |
| 8/31/2017 | $3,869,885 | $2,110,750 |
| **Totals** | **$6,411,866** | **$6,673,077** |

**Stock Option Contracts**

5.   A stock option contract is a security that allows the "holder" to buy, if it is a call, or sell, if it is a put, an underlying stock at a fixed price, the "strike price," on or before a specified date, the "expiration date." For every purchase of an option contract, there is a sale, or a counter-party who "writes" the contract. Option contracts are "derivatives" because the holder has the right to buy or sell the underlying stock. An option contract derives its value from the holder's ability to buy or sell the underlying stock.

6.   If a PANW call option contract is "in the money," PANW stock is trading at a price

DECLARATION OF ALEXANDER SCOUFIS          2
19-CR-00463 RS

above the strike price. The holder of an in the money PANW call option contract may choose to "exercise" their right under the contract to buy PANW stock at the strike price. When a PANW call option contract is exercised, the writer must sell PANW stock to the holder at the strike price. The operation of a call option contract often means that the writer either initially held PANW stock, or must purchase PANW stock through the market, and the holder then becomes a PANW shareholder upon exercising.

7.    A PANW put option contract is in the money if PANW stock is trading at a price below the strike price. The holder of an in the money PANW put option contract may choose to "exercise" their right under the contract to sell PANW stock at the strike price. When a PANW put option contract is exercised, the writer of the contract must buy PANW stock from the holder at the strike price. The operation of a put option contract often means that the holder initially held PANW stock, or must purchase PANW stock through the market, and the writer then becomes a shareholder of PANW stock.

8.    Options traders employ various options strategies that also involve holding the underlying stock. For example, a "covered call" is a popular strategy where a trader buys the underlying stock and simultaneously writes a call option on those same shares. Market makers, firms that create liquidity in securities markets, also commonly hedge their options trades by buying and selling the underlying stock to stay neutral. Whether by exercising an option contract, trading strategies, or market maker hedging, trading option contracts often includes holding the underlying stock.

**Pricing**

9.    At its core, stock pricing reflects the basic economic forces of supply and demand. When more investors want to buy a security than sell it, prices rise. When selling pressure exceeds buying interest, prices fall. Supply and demand are driven by factors such as company performance, economic conditions, interest rates, geopolitical events, and investor sentiment. Option contracts are similarly subject to such economic forces due to its relationship with the underlying stock.

10.    While it is commonly understood that an underlying stock is the driver of option contract pricing, option contracts also play a role in the underlying stock's pricing. As discussed above, holders and writers of option contracts often buy and sell the underlying stock which directly affects its pricing. Consider the option contract market maker purchasing or selling the underlying stock to keep their

DECLARATION OF ALEXANDER SCOUFIS          3
19-CR-00463 RS

position neutral. As stock prices rise, the market maker will purchase shares to maintain their hedge which can create upward momentum in the underlying stock price. Conversely, when stock prices fall, market makers sell shares to adjust their hedges, potentially accelerating downward moves.

11. Option contracts also have an outsized importance in information signaling and price discovery. Due to leverage, sophisticated traders may prefer to express their views through options. Heavy call buying might signal bullish sentiment to stock buyers and drive stock purchases. Heavy put buying might warn of negative sentiment and drive stock sales. The effects of the traditional valuation relationships, hedging, and information signaling are especially pronounced during major events such as earnings announcements and often result in feedback loops between pricing of the underlying stock and option contracts.

**Harm Caused by Insider Trading**

**1. Counterparties**

12. Public securities markets such as the NYSE consist of buyers and sellers coming together to trade securities. The market for each public security may include hundreds, thousands, or even hundreds of thousands of individuals and entities trading a security on any given day. Due to U.S. public securities' use of clearinghouses, market makers, and intermediation, it is often challenging to identify the exact individual or entity selling securities to a buyer. It is similarly difficult to identify the exact individual or entity buying securities from a seller. Despite our limited ability to identify a counterparty's identity, for every buyer, there is a seller and for every seller, a buyer.

13. Barama traded opposite real individuals and entities even if the exact identity remains unknown. Assuming that a counterparty would choose not to trade with Barama if they understood that Barama was trading based on an unfair informational advantage, Barama's profits only exist because he failed to disclose his unfair informational advantage. Therefore, victim losses can be reasonably approximated as the inverse of Barama's profits.

**2. Securities Markets and Society**

14. PANW, like all public companies, is owned by its shareholders. When PANW suffers harm, its shareholders suffer harm. As discussed previously, the inherent operation of a PANW option contract means that market participants hold a vested interest in PANW stock or are already holders of

DECLARATION OF ALEXANDER SCOUFIS          4
19-CR-00463 RS

PANW stock. When Barama traded based on MNPI, the counterparty likely held shares to hedge, held shares to sell as the writer of a call option contract, or bought shares as the writer of a put option contract. Thus, Barama misappropriated information owned by PANW shareholders and likely used it to their detriment.

### 3. PANW's Share Repurchase Program

15.    On August 26, 2016, PANW authorized[1] a $500 million share repurchase program and on February 24, 2017 authorized[2] a $500 million increase to the existing share repurchase program.[3] During the period of November 1, 2016 to July 31, 2017, PANW reported repurchasing 2,900,000 shares through the share repurchase program for a total cost of $363,877,000.[4] Importantly, from approximately November 2016 through August 2017, PANW was an active market participant while Barama was actively trading PANW securities based on MNPI.

16.    As discussed previously, option contracts have an outsized importance in information signaling and price discovery. As Barama utilized MNPI to trade ahead of earnings announcements, it likely contributed to an artificial increase or decrease of PANW stock and option contracts. As PANW itself was an active participant in the market during this period, PANW likely purchased securities at prices that had been impacted by Barama's use of MNPI.

### Valuing Misappropriated MNPI

17.    The MNPI improperly obtained by Barama had an economic value, as shown by the fact that Barama was able to convert the confidential information he had into funds though trading PANW securities in the public markets.  There are a couple ways that a person with MNPI, like Barama, can convert information into money, and both of those ways of converting information to money can be a

---

[1] PANW, Form 8-K Date of Report August 26, 2016 (filed August 30, 2016).

[2] PANW, Form 8-K Date of Report February 28, 2017 (filed February 28, 2017).

[3] According to PANW, "repurchases may be made at management's discretion from time to time on the open market through privately negotiated transactions, transactions structured through investment banking institutions, block purchase techniques, 10b5-1 trading plans, or a combination of the foregoing." PANW Form 8-K Date of Report August 26, 2016 (filed August 30, 2016).

[4] See PANW, Form 10-Q for the Period Ending January 31, 2017 (filed March 1, 2017); PANW, Form 10-Q for the Period Ending April 30, 2017 (filed June 1, 2017); PANW, Form 10-K for the Period Ending July 31, 2017 (filed September 7, 2017). Total cost is calculated by multiplying total number of shares purchased by the average price paid per share, exclusive of costs associated with the repurchases.

DECLARATION OF ALEXANDER SCOUFIS          5
19-CR-00463 RS

way to estimate the value of the MNPI that Barama misappropriated from PANW. First, in order to realize the economic value of the misappropriated MNPI a trader could use the information to make well-timed and profitable trades in options or stock, as Barama did.  The value of the MNPI can be considered to be at least Barama's proceeds from converting the MNPI through his trading in advance of the four earnings announcements in 2016 and 2017. Second, the misappropriated MNPI can be converted to a profit by selling the information itself, and another estimate of the value of the information is the price any potential purchaser may pay for such information. As insider trading is illegal, there is not a readily available market which would assist us in valuing the misappropriated MNPI. However, a hedge fund or other trader with increased sophistication, capital, and market access would likely find the information more profitable, and therefore more valuable, than Barama. Therefore, considering these two ways to convert MNPI to economic value, Barama's trading profits represent a conservative, provable measure of the value of the misappropriated MNPI.

**Harm from Reputational and Regulatory Risk**

18.    Insider trading risks vast reputational harm. If potential investors in PANW believe counter parties are trading based on an unfair informational advantage, they may be reluctant to trade PANW's securities. Decreased investor trust in PANW can lead to lower liquidity and lower stock prices which ultimately leads to PANW shareholder loss.

19.    PANW also faces risks from NYSE and government enforcement actions. Section 303A.10 of NYSE's Listed Company Manual states a "listed company should proactively promote compliance with laws, rules and regulations, including insider trading laws" and that "[i]nsider trading is both unethical and illegal, and should be dealt with decisively." Further, liability under 21A of the Exchange Act extends liability to publicly held companies that recklessly disregard the risk of employees engaging in insider trading and fail to take appropriate steps to prevent such conduct. Barama's insider trading risks a potentially catastrophic outcome in which PANW is delisted and would harm shareholders by depriving them access to capital markets.

20.    Reputational risks extend beyond the risks to PANW and its shareholders. The integrity of U.S. securities markets depends fundamentally on investor confidence, and insider trading rapidly erodes investor confidence in fair markets. Insider trading poses a structural threat to U.S. capital

DECLARATION OF ALEXANDER SCOUFIS            6
19-CR-00463 RS

markets' ability to fund economic growth and provide opportunities for wealth creation across all segments of society.

**Conclusion**

21.　Barama's insider trading harmed PANW and its shareholders through counterparty transactions, impacting PANW stock prices, and causing reputational risk. While Barama's trading profit may not fully account for loss suffered by PANW, it does provide a tangible assessment of loss.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Leadville, Colorado on June 23, 2026.

ALEXANDER SCOUFIS

DECLARATION OF ALEXANDER SCOUFIS　　　7
19-CR-00463 RS