HICKEY & CHUNG, LLP
Naomi Chung (SBN 283743)
chung@defender.law
Pier 9, Suite 100
San Francisco, CA  94111
T: (415) 942-9000
F: (415) 484-7054

Attorney for Defendant
SIVANNARAYANA BARAMA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 19-cr-00463-002-RS |
| Plaintiff, | **DEFENDANT BARAMA'S RESPONSE TO GOVERNMENT'S RESENTENCING MEMORANDUM** |
| v. | |
| SIVANNARAYANA BARAMA | |
| Defendant | |

**I.    *Yafa* Did Not Eliminate the Requirement That Gain Approximate the Victim's Loss.**

The government contends that *Yafa* superseded the *Barama* and *Abouammo* panels' loss analysis, and that under *Yafa* this Court need not require gain to approximate, or serve as a proxy for, the victim's loss. ECF 320 at 3-6. *Yafa* decided a narrower question. It resolved whether the gain commentary may be consulted at all. It did not address, much less eliminate, the separate requirement that gain, when used, must approximate the victim's loss. The only question before the Ninth Circuit was whether it is appropriate to defer to the commentary's interpretation of a Guideline, *see Yafa*, 136 F.4th at 1197, and the court held that it is.

The court had no occasion to address approximation, because approximation was not in dispute. The district court had already ensured that gain approximated the victims' losses. The government's

expert, Alexander Scoufis[1], calculated actual losses of $121,599.70 as to nine identified open-market victims, and the sentencing court found that his analysis provided a reasonable estimate of the identified open-market-victim loss. Sent'g Hr'g Tr. at 16-17, *United States v. Yafa*, No. 21-cr-1310-WQH (S.D. Cal.). For the portion of losses that were "exceedingly difficult to calculate," the court relied on "gain as a proxy for a portion of the total loss" that could not be determined. *Yafa*, 136 F.4th at 1197. Gain served as a reliable proxy in that setting because the defendants' manipulation of the stock price not only produced their profits, but also caused the investors' losses. The defendants pumped the stock through affirmative fraud and sold their shares at inflated prices, and the investors who purchased at those prices lost their money when the fraud collapsed. The manipulation was the but-for cause of both the gain and the loss: had the defendants not pumped the price, the investors who bought at the inflated price would not have lost their money, and the defendants would not have profited. Because one fraudulent course of conduct caused both, the gain necessarily approximated the loss.

Moreover, the *Yafa* court confirmed that gain remains tied to actual loss, holding that Note 3(B) "merely provides courts with another method to determine the actual loss resulting from a defendant's conduct," and that it "does not expand the definition of 'loss.'" *Yafa*, 136 F.4th at 1199. *Yafa* thus describes gain not as a freestanding substitute for loss but as an estimation tool that approximates a loss the court has found to exist. That is the approximation requirement the *Barama* panel applied when it remanded this case.

The *Barama* panel held that "loss" in former § 2B1.1(b)(1) "was not so ambiguous as to allow for a 'gain' that does not approximate the victim's loss," and that the district court "erred in using Barama's gain as a substitute for PANW's loss without making any findings on the victim's loss." *United States v. Barama*, 2025 WL 303086, at *3 (9th Cir. Jan. 27, 2025). The panel did not hold that "loss" is unambiguous in the abstract. It held that whatever ambiguity the term carries does not stretch so far as to permit gain untethered to the victim's loss. That holding sits comfortably alongside *Yafa*: *Yafa* establishes that "loss" is ambiguous enough to permit resort to the commentary, and *Barama* establishes that it is not so ambiguous as to permit substitution of gain with no nexus to loss. The two decisions

---

[1] The government's expert here is the same Alexander Scoufis who served as the government's expert in *Yafa*.

occupy different points on the same analysis.

*Barama*'s status as a nonprecedential disposition diminish its force here. It is the law of the case, the disposition that vacated Mr. Barama's sentence and remanded for resentencing, and its reasoning governs on remand except to the extent intervening authority displaces a specific holding. But a decision can only displace a holding it actually reached, and *Yafa* never addressed the approximation requirement. *Yafa* decided whether the commentary is entitled to deference, and nothing more. The *Barama* panel's reading also accords with published Ninth Circuit authority requiring the government to prove an actual, defendant-caused loss before gain or any other method may be used to estimate it. *United States v. Berger*, 587 F.3d 1038, 1045–46 (9th Cir. 2009) (the "reasonable estimate" provision "does not obviate the requirement to show that actual, defendant-caused loss occurred"; "without any loss to victims, there would be nothing on which to base an estimate"). Thus, this Court may and should follow the panel's reasoning.

**II.     The Use of Gain in *Yafa* Does Not Justify Its Use in Mr. Barama's Case.**

Even accepting *Yafa*'s holding that the commentary is entitled to deference, the facts of *Yafa* support the defense, not the prosecution. In *Yafa*, every party—the government, the defense, and Probation—agreed that the scheme caused actual monetary losses to investor victims. The sentencing court framed the dispute as one over the amount of the loss, not its existence. Sent'g Hr'g Tr. at 8, *United States v. Yafa*, No. 21-cr-1310-WQH (S.D. Cal.) (Jamie Yafa sentencing); Sent'g Hr'g Tr. at 14, *Yafa*, No. 21-cr-1310-WQH (S.D. Cal.) (Joshua Yafa sentencing). The government's expert, Mr. Scoufis, calculated actual, defendant-caused losses of $121,599.70 as to nine identified open-market victims, an amount that accounted for only a small subset of what the court described as "a large class of victims". Sent'g Hr'g Tr. at 16, *Yafa*, No. 21-cr-1310-WQH (S.D. Cal.) (Jamie Yafa sentencing); Sent'g Hr'g Tr. at 16, *Yafa*, No. 21-cr-1310-WQH (S.D. Cal.) (Joshua Yafa sentencing). Because applying the same victim-by-victim calculation to that larger class would have been "exceedingly difficult," the court turned to gain to estimate the remainder. *Yafa*, 136 F.4th at 1197. The court turned to gain only because an actual loss existed.

Here the analysis cannot begin in the same place, because the existence of any loss to PANW is disputed. The government contends that the trial record and Mr. Scoufis's declaration together establish

a loss; Probation and the defense maintain they do not. That dispute over the very existence of loss is the first respect in which this case differs from *Yafa*, where the fact of investor loss was common ground and only its amount was contested. The second difference is more fundamental. In *Yafa*, the nature of the pump-and-dump scheme left no question that individual investors had lost money, and Mr. Scoufis even quantified actual losses sustained by nine of those investors. But here, Mr. Scoufis has not proven any loss to PANW or any third party. He has offered no event study, no price-impact analysis, and no quantification of any kind. Instead, he presents mere theories of ways in which PANW, and its counterparties *might* have been harmed. *See* Regan Decl. ¶ 13. But a theory that PANW might have been harmed does not establish that it was in fact harmed. That is not the kind of record that justified the use of gain in *Yafa*, and it is not proof of loss by any standard.

Furthermore, in *Yafa*, the scheme's organizer controlled over 99% of the company's freely tradable stock, and the defendants manipulated the price through affirmative fraud and sold their shares at inflated prices to unsuspecting investors who lost their money when the scheme collapsed. Gov't Sent'g Mem. (Jamie Yafa) at 3; *Yafa*, 136 F.4th at 1196. The defendants' conduct was the but-for cause of the investors' losses, which would not have occurred without it. Conversely, Mr. Barama's options trading accounted for approximately 0.2% of PANW's trading volume. Regan Decl. ¶ 8. He did not influence or control PANW's stock in the way that the defendants did in *Yafa*, and the government has presented no evidence to suggest otherwise. PANW's stock price moved because of legitimate earnings announcements, not because of anything Mr. Barama did. There is no evidence that his trading created the price movements his counterparties experienced or that his trading influenced any counterparty's trading decisions. His counterparties would have made the same trades whether or not he was in the market. The government has not shown that any counterparty suffered a loss, let alone one caused by Mr. Barama's trading. His profit cannot serve as a proxy for a loss it has not proven.

### III.    The Government Has Not Proven That PANW Suffered an Actual Monetary Loss.

The government contends that the trial record and Mr. Scoufis's analysis together establish a pecuniary loss to PANW. ECF 320 at 7-8. Neither does. The government does not identify any trial testimony establishing that PANW sustained an actual monetary loss from Mr. Barama's trading, and

Mr. Scoufis's declaration supplies no such proof. He performed no event study, conducted no price-impact analysis, and identified no counterparty who lost money. He offered no evidence that PANW suffered any measurable financial consequence from Mr. Barama's trading, such as increased bid-ask spreads, a higher cost of capital, reduced trading volume, or a decline in its stock price. Regan Decl. ¶¶ 7–12. He did not so much as overlay Mr. Barama's trade dates against PANW's repurchase dates to test his own share-repurchase theory. Regan Decl. ¶ 8. And the $363,877,000 repurchase figure on which the government relies establishes only that PANW repurchased its shares at some point, not that it overpaid for them because of Mr. Barama's trading. Mr. Regan, reviewing each of Mr. Scoufis's theories, concluded that they consisted of generalizations that did not prove that PANW or any counterparties suffered monetary loss. *See* Regan Decl. Probation, reviewing the same record, could also see that the government expert's declaration failed to provide any evidence regarding actual pecuniary loss suffered by PANW. Suppl. PSR at 2. The government alone bears the burden of proving that a loss exists, and theories of possibly harm do not satisfy that burden.

Mr. Scoufis's valuation of the MNPI warrants separate attention. Mr. Scoufis describes Mr. Barama's $6,673,077 in trading profits as a "conservative, provable measure of the value of the misappropriated MNPI", Scoufis Decl. ¶ 17, and the government characterizes this figure as a "floor, not an upper limit, to the value." ECF 320 at 4. But calling gain a "floor" on the value of stolen information does not convert gain into loss. The reasoning is circular: the information is said to be worth $6,673,077 only because Mr. Barama realized that amount. Regan Decl. ¶ 9. PANW would never have monetized its own quarterly earnings through a trading strategy, and Mr. Scoufis concedes that there is no readily available market for inside information. Scoufis Decl. ¶ 17. The government's theory thus assumes the very fact it must prove. It points to Mr. Barama's gain and treats that figure as PANW's loss, but a defendant's profit is evidence of what the defendant gained, not of what the victim lost. The government must still prove that PANW sustained an actual pecuniary loss; it cannot satisfy that burden by relabeling Mr. Barama's gain as PANW's loss. The Ninth Circuit rejected this theory in *United States v. Abouammo*, No. 22-10348, 2024 WL 4972564, at *2 (9th Cir. Dec. 4, 2024), holding that "there is too much of a disconnect between the nature of that asserted loss and Abouammo's gain, and the record does not bridge the gap." The government correctly notes that *Abouammo* is an unpublished disposition and

not precedent under Ninth Circuit Rule 36-3, but it is nonetheless persuasive authority that is directly on point and rejects the same misappropriation-based loss theory the government advances here.

Unable to establish loss through the evidentiary record, the government turns to *United States v. O'Hagan*, 521 U.S. 642 (1997), and U.S.S.G. § 2B1.4. ECF 320 at 7. *O'Hagan* addressed whether misappropriation constitutes fraud under § 10(b), not whether it causes a pecuniary loss for Guidelines purposes. *O'Hagan*, 521 U.S. at 647, 652–54. The court observed that "[a] company's confidential information . . . qualifies as property to which the company has a right of exclusive use." *Id*. at 654. But it did not address sentencing, the Guidelines, or loss calculation. Here, the government uses the "property" language from *O'Hagan* to reason that because PANW's information was property that Mr. Barama misappropriated, PANW suffered a "loss" under § 2B1.1. But that reasoning conflates two distinct inquiries. The first, which *O'Hagan* addressed, is whether the conduct constitutes fraud. The second, which the Guidelines require, is whether the fraud caused "reasonably foreseeable pecuniary harm" to the victim. U.S.S.G. § 2B1.1, cmt. n.3(A)(i). *O'Hagan* answered only the first. The second turns on the word "pecuniary," which requires monetary harm, not the abstract loss of a right of exclusive use, and that is where the government's syllogism fails. Misappropriation of information is not the theft of money or tangible property. When money is stolen, the company no longer has it, and the pecuniary harm is self-evident. When confidential earnings information is used to trade options, the company still possesses that information; it is not depleted, consumed, or destroyed. PANW reported the same earnings, conducted the same business, and retained the same information after Mr. Barama's trading as before. *O'Hagan* establishes that Mr. Barama's conduct was criminal; however, it does not establish that PANW suffered a pecuniary loss for Guidelines purposes.

Section 2B1.4 also does not supply the loss the government failed to prove. The government concedes that § 2B1.4 does not apply to Mr. Barama, because his conviction under 18 U.S.C. § 1348 is routed by the Statutory Index to § 2B1.1. ECF 320 at 7 & n.2. It argues instead that § 2B1.4's background commentary, which recognizes that insider trading generally involves "loss, though one that is difficult or impossible to identify," should inform the loss analysis under § 2B1.1. But the controlling guideline here is § 2B1.1, and § 2B1.1 requires the government to prove "actual loss," defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. n.3(A)(i).

A *general* observation in another guideline's commentary that insider-trading loss is often hard to identify does not relieve the government of its burden to prove the existence of loss before resorting to gain.

In addition, the government cannot have it both ways. Section 2B1.4 is the Commission's guideline for insider trading prosecuted under § 10(b) of the Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder, and it measures the offense by the defendant's gain. U.S.S.G. § 2B1.4(b)(1). The government did not charge Mr. Barama under § 10(b). It charged him under § 1348, a distinct offense with elements that do not match those of a Rule 10b-5 violation. Section 1348 may not even require the personal-benefit element that a Rule 10b-5 tipping case demands, a question the Ninth Circuit has expressly left open. *See Barama*, 2025 WL 303086, at *3. The Commission treated them as distinct as well. Nothing in § 2B1.1 cross-references § 2B1.4, and nothing in the Guidelines permits a court to graft § 2B1.4's gain measure onto a § 1348 conviction sentenced under § 2B1.1. Having chosen to prosecute under § 1348, the government is bound by the guideline that conviction carries, including § 2B1.1's requirement that it prove an actual pecuniary loss before resorting to gain.

For these reasons, the Court should conclude that the government has not established a loss under § 2B1.1(b)(1), and that the advisory Guidelines range applicable to Mr. Barama is zero to six months.

Respectfully Submitted,

Dated: June 27, 2026

/s/ _____
NAOMI CHUNG
Attorney for Sivannarayana Barama